UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LARRY X CONIC,

        Petitioner,

v.                              CASE NO. 05-CV-73944-DT
                                  HONORABLE ARTHUR J. TARNOW

MILLICENT WARREN,

        Respondent.
_____/

## OPINION AND ORDER DENYING HABEAS CORPUS PETITION

This matter is pending before the Court on petitioner Larry X Conic's habeas corpus petition under 28 U.S.C. § 2254. Petitioner has been convicted of first-degree murder and other offenses. Although his claims initially persuaded the Court to conclude that he had stated an arguable claim of actual innocence, upon further review, the Court concludes that Petitioner has not shown actual innocence. Therefore, he is not entitled to relief, and the habeas petition is denied.

## I. Background

### A. State Court Proceedings

Petitioner was charged in Saginaw County, Michigan with first-degree murder under alternative theories: felony murder and premeditated murder. He also was charged with two counts of assault with intent to murder, one count of armed robbery, and one count of possession of a firearm during the commission of a felony (felony firearm). The charges arose from an incident on November 11, 1989, when Petitioner, Steve

Adams, and Otis Penelton went to a house on South Warren Street in Saginaw, Michigan. Upon

entering the house, Petitioner went to the living room and asked Marcus Surles, "Where is my

money?" Surles responded, "What money?" Petitioner continued to ask where his money was,

and Surles answered that he did not owe Petitioner any money. Petitioner then shot Surles on

his lip. Petitioner continued to fire at Surles, and Steve Adams joined in. Surles was shot in the

lip, chest, arm, and head. Adams shot Willie Ashford who was seated next to Surles. Adams

then went through Surles' pockets and removed $60, and Petitioner tossed a bag of cocaine,

which Surles had dropped, to Adams.

Linda Mac Donald was present in the house and apparently walked from the living room

to the bathroom at the time of the shooting. As Petitioner, Steve Adams, and Otis Penelton

exited the house, Petitioner fired several gunshots into the bathroom where Linda MacDonald

was standing and screaming. Ms. MacDonald died from a gunshot wound sustained during the

incident. Marcus Surles and Willie Ashford survived and testified against Petitioner at trial, as

did Otis Penelton.

On May 16, 1990, a Saginaw County Circuit Court jury found Petitioner guilty of:

felony murder, MICH. COMP. LAWS § 750.316(1)(b); second-degree murder, MICH. COMP. LAWS

§ 750.317; two counts of assault with intent to commit great bodily harm less than murder,

MICH. COMP. LAWS § 750.84; armed robbery, MICH. COMP. LAWS § 750.529; and felony firearm,

MICH. COMP. LAWS § 750.227b. At Petitioner's sentencing, the trial court dismissed the

convictions for second-degree murder and armed robbery, because those counts merged into the

guilty verdict for felony murder. The trial court then sentenced Petitioner to two years in prison

for the felony firearm conviction, followed by concurrent terms of life imprisonment for the murder and six to ten years in prison for the two assaults.

On appeal from his convictions and sentence, Petitioner argued through counsel that (1) the trial court erroneously admitted a weapon as demonstrative evidence, (2) the trial court should have granted his motion for a directed verdict as to premeditated murder, and (3) the prosecution failed to prove the armed robbery element of felony murder. In support of his third claim, Petitioner maintained that there was no evidence of an intent to rob and that anything taken from the victims was taken to satisfy a debt. The Michigan Court of Appeals found no merit in these claims and affirmed Petitioner's convictions in an unpublished *per curiam* opinion. *See People v. Conic*, No. 130946 (Mich. Ct. App. Oct. 28, 1992). Petitioner raised the same claims in the Michigan Supreme Court, which denied leave to appeal on March 29, 1993, because it was not persuaded to review the issues. *See People v. Conic*, 442 Mich. 880; 550 N.W.2d 473 (1993) (table).

Petitioner raised his habeas claims in a motion for relief from judgment filed on or about June 23, 2003. The trial court denied his motion because it found no merit in the claims and because it thought that Petitioner was rehashing issues which he had raised on appeal. The Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal the trial court's decision on the ground that Petitioner had failed to establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. Conic*, No. 250373 (Mich. Ct. App. Mar. 11, 2004); *People v. Conic*, 471 Mich. 899; 688 N.W.2d 82 (2004) (table). The United States

Supreme Court denied Petitioner's application for a writ of certiorari. *See People v. Conic*, 546

U.S. 837 (2005).

### B. Federal Court Proceedings

Petitioner filed his habeas corpus petition on October 14, 2005. His claims are:

I.      Petitioner's felony murder was based on a misinterpretation of the
        underlying robbery statute. When the Michigan Supreme Court
        corrected the robbery statute it revealed Petitioner's shooting was
        never "in the perpetration" of robbery, and there is insufficient
        evidence of felony murder without that connection. Petitioner's
        felony murder rests on insufficient evidence under the 14th
        A[mendment].

II.     The trial court had a duty to give the claim of right instruction *sua
        sponte*, because the whole case arose from collecting a debt.
        Failure to provide the instruction sent the jury to deliberate without
        the tools they needed to find guilt - innocence. It denied a fair
        trial, and due process under the 5th and 14th Amendments.

III.    Trial counsel had a duty to request the claim of right instruction
        even if the court did not. Counsel was constitutionally ineffective
        for failing to request the claim of right and failing to interview
        Steve Adams, who was the eye of the robbery storm. His failures
        violated the 6th and 14th Amendments under *Strickland v.
        Washington*, 466 US 668.

IV.     Appe[llate] counsel was ineffective for failing to consult with
        Petitioner or investigate the case. If this Court finds *Strickland* is
        not satisfied, Petitioner argues that Michigan's Freedom of
        Information Act impedes access to documents needed to overcome
        *Strickland's* presumption of adequate counsel.

Respondent moved to dismiss the habeas petition because Petitioner failed to comply

with the one-year statute of limitations. The Court denied Respondent's motion after concluding

that Petitioner had stated an arguable claim of actual innocence, which was sufficient to

overcome his failure to comply with the statute of limitations. The Court subsequently

4

appointed counsel for Petitioner.  Supplemental pleadings were filed, and the case is now ready

for review.

## II.  Standard of Review

Section 2254(d) of Title 28, United States Code, imposes the following standard of

review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim –
>
> (1)     resulted in a decision that was contrary to, or involved an
>         unreasonable application of, clearly established Federal law, as
>         determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable
>         determination of the facts in light of the evidence presented in the
>         State court proceedings.

28 U.S.C. § 2254(d).  Additionally, this Court must presume the correctness of state court factual

determinations.  28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state

court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law

or if the state court decides a case differently than the Supreme Court has on a set of materially

indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable

application occurs" when "a state-court decision unreasonably applies the law of [the Supreme

Court] to the facts of a prisoner's case."  *Id*. at 409.  A federal habeas court may not "issue the

writ simply because that court concludes in its independent judgment that the relevant state-court

decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

## III. Discussion

### A. Sufficiency of the Evidence

Petitioner alleges that there was insufficient evidence to support his felony murder conviction, because the murder conviction was based on a misinterpretation of the robbery statute and the shooting of Linda Mac Donald was not done during the perpetration of the robbery. In other words, Petitioner claims that he is not guilty of felony murder because the robbery in the living room of the house did not extend to the subsequent shooting near the bathroom. The trial court found no merit in this claim when Petitioner raised it in his motion for relief from judgment, and the Michigan Court of Appeals concluded on direct review that the evidence was sufficient to convict Petitioner of felony murder and the underlying felony. Lv. denied 442 Mich. 880; 550 N.W.2d 473 (1993) (table).

#### 1. Legal Framework

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). After *Winship,* the critical question on review of the sufficiency of the evidence to support a criminal conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

The Jackson "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id*. at 324 n.16. In Michigan,

> [t]he elements of felony murder are: (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [the statute, including armed robbery].

*People v. Carines*, 460 Mich. 750, 759; 597 N.W.2d 130, 136 (1999).

### 2. Application

There can be no doubt that Petitioner was responsible for killing Linda Mac Donald. Although he denied possessing a gun, eyewitnesses to the crime testified that Petitioner was armed with an automatic rifle and that he fired his rifle into the bathroom when he heard or saw Linda MacDonald there. Thus, the prosecutor satisfied the first element.

The prosecutor also satisfied the second element of felony murder. The jury could have inferred from Petitioner's use of an automatic rifle that he intended to kill or to do great bodily harm to Ms. Mac Donald. At a minimum, the jury could have inferred that Petitioner intended to create a high risk of death or great bodily harm, knowing that death or great bodily harm was the probable result.

The question in dispute is whether Petitioner killed Ms. MacDonald while committing or attempting to commit a felony.

> [A] murder that occurs during the uninterrupted chain of events surrounding the commission of the predicate felony is committed 'in the perpetration of' that felony for felony-murder purposes. Accordingly, . . . the term "perpetration" encompasses acts beyond the definitional elements of the predicate felony, to include those acts committed within the res gestae of that felony.

*People v. Gillis*, 474 Mich. 105, 121; 712 N.W.2d 419, 429 (2006).

This *res gestae* principle was adopted by the Michigan Supreme Court in *People v. Podolski*, 332 Mich. 508; 52 N.W. 2d 201 (1952). *Gillis*, 474 Mich. at 121; 712 N.W.2d at 429. The factors that a jury must consider in determining whether a murder was committed during the perpetration of a felony are: time (the period of time between the commission of the predicate felony and the murder); place (the physical distance between the scene of the predicate felony and the scene of the murder); causation (whether there was some causal connection between the murder and the predicate felony); and continuity (whether there was continuity of fact between the predicate felony and the murder). *Id.*, 474 Mich. at 127-31; 712 N.W.2d at 432-34.

The murder in this case occurred minutes after the robbery and in the same house as the robbery. Thus, the time and place factors indicate that the murder was perpetrated during the commission of the underlying felony.

The third factor (causation) also is evident. Petitioner shot and killed Ms. Mac Donald as he was leaving the house. One witness testified that Petitioner appeared to be startled when Ms. Mac Donald emerged from the bathroom, for he turned and shot her as she walked out of the bathroom. There was a causal connection between the murder and the robbery, because the killing occurred while Petitioner was trying to escape.

The fourth and final factor is whether there was continuity of action between the underlying felony and the murder. "[T]here can be no conviction for felony murder where an intervening act has broken the chain of events between the killing and the crime committed or attempted." *Id.*, 474 Mich. at 132; 712 N.W.2d at 435 (quotation marks and citation omitted).

There was no intervening act between the robbery and the murder in this case. As noted, Petitioner shot Ms. MacDonald after he and his accomplices committed the robbery and as he was leaving the house where the robbery occurred. All four factors indicate that Petitioner committed a murder during the perpetration of an armed robbery. The robbery and murder were part of an unbroken chain of events. Thus, a rational juror could have concluded that Petitioner was guilty of felony murder. The state courts' conclusions -- that the evidence was sufficient to convict Petitioner of the underlying robbery and felony murder -- did not result in decisions that were contrary to *Jackson*.

### B. The Lack of a Jury Instruction on a Claim-of-Right Defense; Assistance of Counsel

The remaining claims raise issues regarding Petitioner's alleged claim of right to the money and cocaine taken from Marcus Surles. Petitioner asserts that his trial attorney should have requested a jury instruction on a claim-of-right defense, and, in the absence of such a request, the trial court should have instructed the jury on the defense. Petitioner asserts that the lack of a jury instruction on a claim of right deprived the jurors of the tools they needed to make a proper determination of his guilt or innocence. Petitioner further alleges that his appellate counsel was ineffective for not consulting with him, for implying that the claimed debt stemmed from drugs, and for not raising the issue on appeal.

The trial court found no merit in these claims when Petitioner raised them in his motion for relief from judgment. The Michigan Court of Appeals stated that, although Petitioner may have had a claim to money from Ben Childress, there was no evidence that Marcus Surles owed Petitioner any money. The court of appeals concluded that the evidence was sufficient to convict

Petitioner of felony murder because it could be inferred that he intended to steal from Surles and he shot Linda Mac Donald who was present during the robbery.

A defendant "is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988) (citing *Stevenson v. United States*, 162 U.S. 313 (1896)). To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must demonstrate that his attorney's "performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The Court will proceed to analyze state decisions on the claim-of-right defense to determine whether Petitioner was entitled to a jury instruction on the defense, whether his trial attorney was ineffective for not requesting a jury instruction on the defense, and whether his appellate attorney was ineffective for not raising the issue on appeal.

### 1. *People v. Karasek*

The Michigan Court of Appeals explained in *People v. Karasek*, 63 Mich. App. 706; 234 N.W.2d 761 (1975), that

> "[a] felonious intent is an inseparable and essential ingredient of every larceny, and if a person takes property under a claim of right, however, unfounded, he is not guilty of the offense. In all cases where one in good faith takes another's property under a claim of right to do so, or under a claim of title in himself, he is exempt from a charge of larceny, however mistaken the claim may be in fact. It is a matter of evidence for the jury whether property was bona fide so taken, or whether it was taken with felonious intent."

*Id.*, 63 Mich. App. at 711; 234 N.W.2d at 764 (quoting 3 Gillespie, Michigan Criminal Law & Procedure (2d ed.), § 1799, pp. 2144-2145). A claim of right may not be

"a mere cover for a felonious taking. The taker's claim of right must be
something more than a vague impression; it must amount to an honest
conviction."

*Id.*, 63 Mich. App. at 713; 234 N.W.2d at 765 (quoting 52A C.J.S. Larceny § 26, pp. 449, 450).

Courts generally agree that the collection of money from illegal activities and the
knowledge that a debt was a product of illegal activities negates the existence of good faith on
the part of the defendant. *See id.* To hold that a person may use forcible self-help to retake
illegal drugs from another person would be to give the Court's "imprimatur to an act the
completion of which is itself a criminal offense." *Townsend v. United States*, 549 A.2d 724, 727
n.6 (1988).

Petitioner points out that the Michigan Supreme Court and the Michigan Court of
Appeals have applied a claim-of-right defense to drug cases. *See People v. Holcomb*, 395 Mich.
326; 235 N.W.2d 343 (1975) (finding that the jury instruction on criminal intent tended to vitiate
the defendant's defense that he asked the victim to return his money for the purchase of "bull
drugs," which made his head hurt); *People v. Martin*, 75 Mich. App. 6; 254 N.W.2d 628 (1977)
(finding, in a felony murder case where heroin was involved, that the jury instruction did not
clearly focus the jury's attention on the claim-of-right defense). Despite *Holcomb* and *Martin*,
the Michigan Court of Appeals continues to apply *Karasek* and the principle that a claim of right
may not arise from an illegal transaction. *See, e.g., People v. Randall*, No. 267689, 2007 WL
624641, at *2 (Mich. Ct. App. Mar. 1, 2007) (unpublished), *appeal denied*, 478 Mich. 931; 732
N.W.2d 916 (2007); *People v. Thomlison*, No. 223288, 2001 WL 1231842, at *1 (Mich. Ct. App.
Oct. 16, 2001) (unpublished); *People v. Sturm*, No. 196343, 1998 WL 1989592, at *2 (Mich. Ct.

App. Oct. 20, 1998) (unpublished); *People v. Hubble*, No. 181046, 1997 WL 33350553, at *2 (Mich. Ct. App. Apr. 15, 1997) (unpublished). This Court need not attempt to reconcile *Holcomb* and *Martin* with the *Karasek* line of cases, because the evidence at trial, as summarized below, demonstrates that Petitioner lacked a good faith belief that the victims owed him money and drugs.

### 2. The Facts

Otis Penelton testified that, before the robbery, he heard Petitioner and Steve Adams talking about going to see a guy who owed Petitioner some money. Penelton thought that the amount in question was $200 in crack cocaine and $800 in cash. He heard Steve Adams inform Petitioner that the guy was over at the house on Warren Street. Penelton asked permission to accompany Petitioner and Adams because he thought that they were merely going to collect the money and to scare somebody. The three of them (Otis Penelton, Petitioner, and Steve Adams) then went to the house. Petitioner had an Uzi rifle. He handed two guns to Otis Penelton, and he gave a .22 caliber gun to Steve Adams. Adams asked the occupants of the house whether "Ben" was there. He did not ask for Willie Ashford or Marcus Surles.

Upon entering the house, Petitioner ordered everybody to go in the back room. He approached Marcus Surles and Willie Ashford, but he did not say that he or his accomplices were trying to collect a debt from them. In fact, he sent Otis Penelton to the back of the house to search for the man they had come to see, and he asked Marcus Surles where was his boy. Although Petitioner also asked Surles where was his money, Surles said that he did not owe him any money. Petitioner and Steve Adams then started shooting at Surles.

Willie Ashford also was shot even though he and Marcus Surles testified that they did not know Petitioner at the time and Petitioner testified that he did not know them. Ashford testified that it seemed like Petitioner and Steve Adams had no heart and did not care what they were doing. After the shooting Petitioner tossed some cocaine, which Marcus Surles had dropped, to Steve Adams, who put his hand in Surles' pocket and removed $60. Petitioner later told Otis Penelton that if he (Petitioner) got caught, he was going to do time for what he did.

Petitioner was arrested in Chicago, where he initially gave a false name. He asked one of the arresting officers whether he could turn himself in, and he wondered whether he would get ten years for the case. He claimed that four men had taken $3,000 from him by force and that he later tried to retrieve his money while armed with a nine-millimeter gun. He went on to say that another person had possessed a gun and that there was a shooting during which he fired in self defense. After his return to Michigan, Petitioner told a Saginaw police officer that he was not present at the house and that he knew nothing about the incident.

Petitioner's testimony at trial differed from his pretrial statements to the police. He testified that Steve Adams' uncle and his uncle's friend owed money to Adams. Adams had wanted him to accompany Adams to the house in case his uncle and his uncle's friend jumped him. So the three of them (Petitioner, Steve Adams and Otis Penelton) went to see Adams' uncle and his uncle's friend. Adams was carrying a small gun, and Otis had a long gun, but Petitioner was unarmed. At the house, Adams asked Marcus Surles where was his money. Surles and Willie Ashford then pulled out guns, and Adams started shooting at them. As Petitioner and Adams ran out of the house, Otis Penelton fired the Uzi.

Petitioner denied telling the police that he was owed $3,000 and that he shot someone at the house. He claimed that he had been repeating what he read in the newspapers. He asserted that the other witnesses' testimony that he had fired an Uzi rifle at the occupants of the house was not true. He also testified that he did not know Marcus Surles or Willie Ashford before the day of the crime and that he had no problems with any of the people in the house prior to that day.

### 3. Analysis

Although there was some evidence that Petitioner was owed money or drugs or both, his own testimony indicated that he did not believe he had a right to money or drugs from Surles. He testified that it was Steve Adams who was owed the money and who asked, "Where's my money?" when they approached Marcus Surles. Evidence that Petitioner and his accomplices were heavily armed and fired their guns at Marcus Surles and Willie Ashford after Surles said he did not owe them any money suggests that Petitioner had a felonious intent, not an honest belief in a right to money or drugs.

Petitioner's conduct and comments after the incident also belied an honest belief in a right to drugs or money. He gave contradictory versions of the facts, he fled from the State, he asked about turning himself in, and he spoke of going to prison for the incident.

The Court concludes that Petitioner did not have a good-faith claim-of-right defense. Therefore, the trial court was not remiss in failing to instruct the jury on a claim-of-right defense, and Petitioner's trial attorney was not ineffective for failing to request a jury instruction on a

claim-of-right defense. The Court notes, moreover, that defense counsel did raise the defense in a motion for a directed verdict of acquittal.

Appellate counsel also raised the issue, but in a slightly different guise. He claimed on direct review that the evidence was insufficient to support the felony-murder conviction because there was no evidence of an intent to rob. He argued that, if money were taken, it was taken by another person as a matter of right, that is, to repay a debt. Although he did not argue that the trial court should have instructed the jury on a claim-of-right defense or that defense counsel was ineffective for failing to request such an instruction, those claims are not "clearly stronger than issues that counsel did present." *Smith v. Robbins*, 528 U.S. 259, 289 (2000).

## IV. Conclusion

The state courts' rejection of Petitioner's claims did not result in decisions that were contrary to, or unreasonable applications of, Supreme Court precedent. Therefore, the habeas corpus petition is **DENIED**.


S/Arthur J. Tarnow
Arthur J. Tarnow
United States District Judge

Dated: September 10, 2008


I hereby certify that a copy of the foregoing document was served upon counsel of record on September 10, 2008, by electronic and/or ordinary mail.

S/Catherine A. Pickles
Judicial Secretary